FILED
2025 Sep-22 PM 01:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | |
|---|---|
| **DAVID SIMMONS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 7:24-cv-984-AMM** |
| ) | |
| **SOCIAL SECURITY** ) | |
| **ADMINISTRATION,** ) | |
| **Commissioner,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OF DECISION

Plaintiff David Simmons brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.    Introduction

On May 16, 2022, Mr. Simmons protectively filed an application for benefits under Title II of the Act, alleging disability beginning January 8, 2021. R. 17, 71–77, 175–76. Mr. Simmons alleges disability due to: sleep apnea; high blood pressure; congestive heart failure; impairments concerning his feet, right shoulder, and right arm; shortness of breath; and fluid retention. R. 71.

1

The Social Security Administration ("SSA") initially denied Mr. Simmons's application on December 28, 2022, and again upon reconsideration on August 11, 2023. R. 17, 71–86. On September 11, 2023, Mr. Simmons filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 17, 122–23. That request was granted. R. 132–34. Mr. Simmons received a telephone hearing before ALJ Sheila E. McDonald on February 8, 2024. R. 17, 38–70. On March 22, 2024, ALJ McDonald issued a decision, finding that Mr. Simmons was not disabled from January 8, 2021, through the date of the decision. R. 14–30. Mr. Simmons was forty-five years old at the time of the ALJ decision. R. 28, 30.

Mr. Simmons appealed to the Appeals Council, which denied his request for review on June 25, 2024. R. 1–3. After the Appeals Council denied Mr. Simmons's request for review, R. 1–3, the ALJ's decision became the final decision of the Commissioner and subject to district court review. On July 22, 2024, Mr. Simmons sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.    The ALJ's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done "for pay or

profit." 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. 20 C.F.R. § 404.1520(a)(4)(ii), (c). *Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 404.1525, 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite his impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ finds the claimant unable to perform past relevant

work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with his residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c).

The ALJ determined that Mr. Simmons would meet the insured status requirements of the Act through December 31, 2026. R. 17, 19. Next, the ALJ found that Mr. Simmons "has not engaged in substantial gainful activity since January 8, 2021, the alleged onset date." R. 19 (emphasis omitted). The ALJ decided that Mr. Simmons had the following severe impairments: status post arthroscopy of the right knee with reconstruction; obesity; arthritis of the right shoulder; chronic obstructive pulmonary disease ("COPD"); anxiety; and depression. R. 19. The ALJ found that Mr. Simmons had "nonsevere" impairments that do not cause more than minimal work-related limitations: congestive heart failure; hypertension; obstructive sleep apnea; and diabetes. R. 20. Overall, the ALJ determined that Mr. Simmons "does not have an impairment or combination of impairments that meets or medically

4

equals the severity of one of the listed impairments" to support a finding of disability. R. 20 (emphasis omitted).

The ALJ found that Mr. Simmons's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 23. The ALJ found that Mr. Simmons "has the residual functional capacity to perform sedentary work" with certain limitations. R. 22 (emphasis omitted). The ALJ determined that Mr. Simmons can: occasionally operate foot controls with his right lower extremity; occasionally climb ramps and stairs, stop, kneel, and crouch; frequently reach overhead with his right upper extremity; and occasionally be exposed to extremes of cold and full body vibration as well as atmospheric conditions such as dusts, odors, fumes, and pulmonary irritants. R. 22. The ALJ determined that Mr. Simmons cannot: climb ladders, ropes, or scaffolds; crawl; or be exposed to hazards such as unprotected heights and hazardous machinery. R. 22. The ALJ determined that Mr. Simmons would be able to understand, remember, and carry out simple instructions and tasks; and tolerate changes in the workplace that are infrequent and gradually introduced. R. 22.

The ALJ determined that Mr. Simmons's past relevant work was that of a machine operator. R. 28. The ALJ determined Mr. Simmons is "unable to perform any past relevant work." R. 28 (emphasis omitted).

According to the ALJ, Mr. Simmons is "a younger individual" and has "a limited education," as those terms are defined by the regulations. R. 28–29 (emphasis omitted). The ALJ determined that "[t]ransferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled." R. 29 (emphasis and citation omitted). Because Mr. Simmons's "additional limitations erode the unskilled sedentary occupational base," the ALJ enlisted a vocational expert to ascertain whether there were a significant number of jobs in the national economy that Mr. Simmons could perform. R. 29. That expert concluded that there were indeed a significant number of such jobs in the national economy, such as a nut sorter, cuff folder, and assembler. R. 29.

Based on these findings, the ALJ concluded that Mr. Simmons was not under a disability as defined in the Act, from January 8, 2021, through March 22, 2024, the date of the decision. R. 30. Mr. Simmons now challenges that decision.

## III.   Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision and whether the correct legal standards were applied. *See* 42 U.S.C. § 405(g); *Walker v. Soc. Sec. Admin, Comm'r*, 987 F.3d 1333, 1338 (11th Cir. 2021); *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the

Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision "is reasonable and supported by substantial evidence." *See Martin*, 894 F.2d at 1529 (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *Id*. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## IV.    Discussion

Mr. Simmons raises three claims on appeal. *First*, Mr. Simmons argues that "[t]he ALJ's decision is not supported by substantial evidence" because "[t]he ALJ did not perform a legally sufficient review of the evidence of record." Doc. 9 at 2. *Second*, "[t]he ALJ's decision violated" the controlling regulations "by finding the treating physician's opinion not persuasive." *Id. Third*, "[t]he ALJ's decision did not adequately address the combination of obesity, fatigue, shortness of breath, obstructive sleep apnea, anxiety, and depression." *Id.*

### A. The ALJ's Consideration of Medical Evidence

An ALJ's review "must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). There is no rigid requirement that the ALJ specifically refer to every piece of evidence in her decision. *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 776 (11th Cir. 2016). Instead, the ALJ must consider the medical evidence as a whole and not broadly reject the evidence in the record. *Id.* Erroneous statements of fact in the ALJ's decision are harmless when they do "not affect the ALJ's ultimate determination." *Id.* at 775–76; *see Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (finding ALJ's errors were harmless when substantial evidence supported ALJ's determination).

Mr. Simmons's argument that "[t]he ALJ did not perform a legally sufficient review of the evidence of record" specifically relates to the ALJ's treatment of the medical evidence post-dating Ms. Simmons's 2023 knee surgery. Doc. 9 at 2, 11.

Mr. Simmons alleges that the ALJ summarized the post-surgery records in one paragraph and did not "reference . . . any treatment after April 20, 2023," which resulted in "a selective reading of the record." *Id.* at 11–12.

The Commissioner argues that "[t]he ALJ properly considered evidence relating to [Mr. Simmons's] knee." Doc. 13 at 5 (emphasis omitted). The Commissioner alleges that "[t]he thrust of [Mr. Simmons's] complaint is that the ALJ did not explicitly discuss some individual pages of treatment notes." *Id.* at 6. Further, the Commissioner emphasized that "the ALJ developed a [residual functional capacity] for [Mr. Simmons] that included extensive restrictions on [his] use of his right knee." *Id.* at 9.

When discussing Mr. Simmons's knee injury, surgery, and recovery, the ALJ initially identified as a severe impairment Mr. Simmons's "status post arthroscopy of the right knee with reconstruction" because it "significantly limit[ed his] ability to perform basic work activities." R. 20. The ALJ went on to determine Mr. Simmons's residual functional capacity. R. 22–28. In performing this administrative function, the ALJ considered Mr. Simmons's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." R. 22.

The ALJ described relevant portions of Mr. Simmons's testimony as:

> The claimant testified that he had stopped working as a machine operator in 2020 because his health was failing him.

> . . . He said that his primary care physician prescribed
> Percocet once a day for pain in his chest, shoulder, feet, and
> knee. . . . He rated his pain 10 out of 10 with[out] medication,
> 9 out of 10 with medication. He testified that he had a cane
> that was not prescribed, but he used it all the time and needed
> it to stand and walk. He said that he could stand for five
> minutes before needing to sit down, and he could walk for 25
> yards with the help of his cane. He said that he could sit in a
> regular chair without his feet propped up for 20-30 minutes,
> and he could lift a half-gallon of milk using both hands.

R. 22–23. The ALJ acknowledged Mr. Simmons's knee injury, emergency room visit on March 24, 2023, primary care visit on March 30, 2023, and orthopedic evaluation on April 13, 2023. R. 26. The ALJ described Mr. Simmons's knee surgery: "On April 20, 2023, the claimant underwent arthroscopic surgery on his right knee with reconstruction of his anterior cruciate ligament." R. 26 (citation omitted). The ALJ also described Mr. Simmons's post-surgery treatment:

> Following surgery, the claimant participated in physical
> therapy. On June 2, 2023, the claimant reported that he had
> no pain in his right knee and was ready to walk without
> crutches. He was able to make full revolutions on the exercise
> bike, and he displayed improved strength in his right lower
> extremity. He was discharged from physical therapy on July
> 6, 2023.
>
> The claimant followed up with Dr. Peterson [his primary care
> physician] on July 7, 2023, complaining of chronic knee pain.
> . . . The claimant rated his pain 10 out of 10 in severity.
> Despite his reported pain level, his exam notes state that he
> appeared comfortable and in no acute distress. He walked
> with a normal gait and demonstrated full range of motion. Dr.
> Peterson prescribed Lexapro and Xanax. Following up on
> August 3, 2023, the claimant stated that he . . . was having

> pain all over. . . . but his physical exam findings were
> otherwise normal . . . .

R. 26 (internal citations omitted). The ALJ stated that Mr. Simmons returned to Dr.

Peterson on November 3, 2023, where he "demonstrated a normal gait and normal

range of motion." R. 26–27. The ALJ summarized further visits with Dr. Peterson:

> The claimant followed up with Dr. Peterson on January 4,
> 2024, for pain management. He stated that he thought his
> orthopedic doctor might need to reevaluate his right knee
> because he was in constant pain and could not stand for
> long period without feeling off balance. On examination,
> he demonstrated a normal gait and normal range of
> motion. Dr. Peterson advised the claimant to gradually
> taper off his pain medication. On January 30, 2024, the
> claimant complained of worsening knee pain and
> requested a refill on his Xanax due to depression.

R. 27 (internal citations omitted).

The ALJ specifically acknowledged Mr. Simmons's testimony regarding his

failing health and specifically his knee pain. R. 22. In her decision, the ALJ

specifically discussed Mr. Simmons's surgery, physical therapy, and examination

results. R 26–27. Additionally, the ALJ stated that "the medical evidence of record

does not show that the claimant has the extreme limitations on sitting, standing, and

walking that he described in his testimony." R. 27.  The ALJ continued: "While he

did require assistance with ambulation for a time after his knee injury and resulting

surgery, his physical exam records indicate that he made significant progress, and

his subsequent treatment records do not show that he has continued to require any

assistive device to aid ambulation." R. 27. The court discerns no error in the ALJ's treatment of the medical records related to Mr. Simmons's knee surgery and recovery. Instead, substantial evidence supports the ALJ's finding that while Mr. Simmons's status post arthroscopy of the right knee with reconstruction was a severe impairment, his medical treatment records did not support that he had disabling limitations as a result of his knee injury and surgery in his residual functional capacity beyond those assessed.

The ALJ's decision demonstrates that she considered the entire record and did not cherry-pick facts. She assessed medical records from various sources and cited them throughout her findings. R. 26–28. The ALJ specifically cited positive findings, Mr. Simmons's complaints of pain to his doctors, and his use of pain medication to manage his symptoms. And, the ALJ took care to incorporate Mr. Simmons's complaints of pain into his residual functional capacity, as well as imposing additional limitations to account for and not exacerbate that pain. The ALJ's findings are supported by substantial evidence.

**B. The ALJ's Evaluation of Mr. Simmons's Medical Opinion Evidence**

The SSA has revised the applicable regulations related to medical opinion evidence. The SSA's new regulations, promulgated in 2017, do away with the hierarchy of medical opinions and the treating source rule. 20 C.F.R. § 404.1520c(a). Under the new regulations, an ALJ need not "defer or give any specific evidentiary

weight, including controlling weight, to any medical opinion(s)" for all claims filed on or after March 27, 2017. *Id*. And the ALJ "will articulate in [her] determination or decision how persuasive [she] find[s] all of the medical opinions . . . in [the claimant's] case record." *Id.* § 404.1520c(b).

When evaluating the persuasiveness of the opinions, the ALJ considers these factors: (1) supportability, i.e., how "relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)"; (2) consistency with the evidence; (3) relationship with the claimant, including the nature of the relationship, the length of the treatment relationship, the frequency of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) "[o]ther factors," such as the medical source's familiarity with the agency's policies and the evidence in the claim. *Id.* § 404.1520c(c). Supportability and consistency are the most important of the five factors. *Id.* § 404.1520c(b)(2). Supportability measures how a medical source presents "objective medical evidence and supporting explanations" "to support his or her medical opinion(s)." *Id.* § 404.1520c(c)(1). Consistency measures how a medical opinion compares to "evidence from other medical sources and nonmedical sources in the claim." *Id.* § 404.1520c(c)(2). An ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions . . . in [her] . . . decision." *Id.* § 404.1520c(b)(2). The ALJ may explain how

13

she considered the remaining factors, but she is not required to do so. *Id.* The ALJ is not required to use "magic words" or follow a particular formula to articulate her consideration of the factors. *See id.* § 404.1520c; *Thaxton v. Kijakazi*, No. 1:20-cv-00616-SRW, 2022 WL 983156, at *8 (M.D. Ala. Mar. 30, 2022).

Mr. Simmons argues that the ALJ failed to accord proper weight to a January 8, 2024, Medical Source Statement (Physical) and Clinical Assessment of Pain by Dr. Remona Peterson, Mr. Simmons' treating physician. Doc. 9 at 12; *see also* R. 839–40.

In the Medical Source Statement, Dr. Peterson assessed that, in an eight-hour workday, Mr. Simmons could:

- Sit for one hour;
- Stand or walk for one hour;
- Lift and/or carry ten pounds occasionally to five pounds frequently.

R. 839. Dr. Peterson also opined that Mr. Simmons did not "require an assistive device . . . to ambulate even minimally in a normal work day," but he should "avoid dust, fumes, gasses, extremes of temperature, humidity and other environmental pollutants." R. 839. Dr. Peterson stated that Mr. Simmons could frequently perform "[g]ross manipulation (grasping, twisting, and handling)," "[f]ine manipulation (finger dexterity)," and motor vehicle operation. R. 839. Dr. Peterson stated that Mr. Simmons could rarely perform "[p]ushing and pulling movement (arm and/or leg controls)," "[b]ending and/or stooping movements," and "[r]eaching (including

14

overhead)." R. 839. Dr. Peterson stated that Mr. Simmons could never perform "[c]limbing (stairs or [l]adders) and balancing" and "[w]ork with or around hazardous machinery." R. 839. Dr. Peterson "anticipate[d]" that Mr. Simmons's "impairments or treatment would cause [him] to be absent from work" "[m]ore than three times a month." R. 839. Dr. Peterson affirmed that the limitations are "normally expected from the type and severity of the diagnoses in this case" and "the diagnosis in this case [are] confirmed by objective medical findings." R. 839. When prompted to "[s]tate the medical basis for these restrictions," Dr. Peterson wrote: "Morbid obesity; joint instability & OA of knees and shoulders, all limit mobility. Also associated pain w/ conditions above." R. 839.

In the Clinical Assessment of Pain, Dr. Peterson made the following selections regarding her assessment of Mr. Simmons's pain:

> Question: "To what extent is pain of significance in the treatment of this patient?"
> Selected Response: "Pain is present to such an extent as to be distracting to adequate performance of daily activities."
>
> Question: "To what extent will physical activity such as walking, standing, bending, stooping, waving of extremities, etc. increase the degree of pain experienced by this patient?"
> Selected Response: "Increase of pain to such an extent that bed rest and/or medication is necessary."
>
> Question: "To what extent can the medication(s) that have been prescribed (or are typically prescribed in cases similar to this one) be expected to impact upon the patient in this case?"

> Selected Response: "Significant side effects may be
> expected which may limit effectiveness of work duties or
> performance of everyday tasks, e.g. driving."

R. 840. Dr. Peterson continued by answering affirmatively: "Can this patient's

medical condition reasonably be expected to produce the pain complained of?";

"Does this patient's pain prevent him/her from maintaining attention, concentration

or pace for periods of at least two hours?"; and "In addition to normal breaks every

two hours, will your patient sometimes need to take *unscheduled* breaks during a

working day?" R. 840. Finally, Dr. Peterson opined that Mr. Simmons would be off

task twenty-five percent or more of a typical workday. R. 840.

The ALJ considered and discussed Dr. Peterson's medical opinion in her

residual functional capacity findings:

> The record of evidence includes a medical source
> statement form completed by the claimant's primary care
> physician, Dr. Peterson, on January 8, 2024 (Exhibit 15F).
> I am not persuaded by this assessment for a variety of
> reasons. Dr. Peterson opined that the claimant would not
> be able to perform even sedentary level work due to
> absenteeism, sitting, standing, and walking limitations,
> among others. However, Dr. Peterson fails to establish an
> appropriate nexus between the extreme limitations and the
> relatively benign findings on exam noted in her own
> treatment notes. For example, throughout exhibits 6F,
> 12F, and 16F, the exam notes state that the claimant
> walked with a normal gait. While there is an increase in
> treatment after the claimant's knee issue, there is nothing
> in the medical record to suggest that his knee problems
> persist to such a degree as assessed by Dr. Peterson. In
> exhibit 13F, for example, he is assessed as doing well and
> progressing without the need for crutches or other assistive

16

> device. He is not noted, for example to be unable to walk
> at his neurology appointments. For all of these reasons, I
> am not persuaded by this assessment.

R. 28.

Mr. Simmons argues that the ALJ did not give sufficient rationale for rejecting the opinion of Dr. Peterson. Doc. 9 at 13–14. Specifically, Mr. Simmons argues that the ALJ did not consider limitations from physical examinations, Dr. Peterson's opinion was supported by the consultative examination, and orthopedic records. *Id.* Finally, Mr. Simmons argues that the ALJ "fail[ed] to address the supportability and consistency of Dr. Peterson's opinion." *Id.* at 15. The Commissioner argues that "the ALJ properly evaluated Dr. Peterson's opinion." Doc. 13 at 16.

As an initial matter, the ALJ "considered th[is] medical opinion[] . . . in accordance with the requirements of 20 CFR 404.1520c." R. 22. Additionally, she stated: "As for medical opinions . . . , I cannot defer or give any specific evidentiary weight, including controlling weight, to any . . . medical opinion, including those from medical sources." R. 27. She reiterated that she "fully considered the medical opinions . . . following the requirements in 20 CFR 404.1520c." R. 27. The ALJ articulated how persuasive she found the opinion, as required by the regulations. R. 28 ("I am not persuaded by this assessment . . . ."); *see* 20 C.F.R. § 404.1520c(b).

The ALJ applied the correct legal standards in evaluating Dr. Peterson's opinion, and substantial evidence supports her finding that it was not persuasive

because it is not supported by or consistent with her own "relatively benign findings on exam." *See* R. 28. In assessing supportability, the ALJ stated that Dr. Peterson "fails to establish an appropriate nexus between the extreme limitations" in her medical opinion "and the relatively benign findings on exam noted in her own treatment notes." R. 28. In assessing consistency, the ALJ also noted there is "nothing in the medical record" to support the persistent knee problems assessed by Dr. Peterson. R. 28. Before the ALJ made this finding with respect to Dr. Peterson's medical opinion, the ALJ detailed Mr. Simmons's knee injury, resulting surgery, physical therapy, and medical visits following surgery. R. 26–28. The ALJ also detailed Mr. Simmons's visits to Dr. Peterson for this and other issues. R. 23 (May 19, 2022 visit to establish care); R. 24 (May 24, 2022 visit regarding sleep apnea); R. 24 (September 28, 2022 visit for shoulder pain); R. 24–25 (December 9, 2022 visit for dizziness, fatigue, shortness of breath, chest pain, nausea, elevated blood pressure, and tachycardia); R. 25 (January 9, 2023 visit for shortness of breath and cough); R. 25–26 (February 20, 2023 visit for obesity); R. 26 (March 30, 2023 visit for right knee injury and orthopedist referral); R. 26 (July 7, 2023 visit for chronic knee pain); R. 26 (August 3, 2023 visit for depression, pain, and seizure-like episodes); R. 26–27 (November 3, 2023 visit for anxiety); R. 27 (January 4, 2024 visit for pain management); R. 27 (January 30, 2024 visit for knee pain and depression).

Under the new regulations, the ALJ adequately accounted for her finding regarding Dr. Peterson's medical opinion. The ALJ's decision reflects that she considered Dr. Peterson's own examination findings in her analysis. R. 28. The ALJ expressly considered Dr. Peterson's examination findings for a year and a half as well as the entirety of her medical opinion. R. 24–28. Additionally, the ALJ cited other medical evidence in the record that was inconsistent with Dr. Peterson's medical opinion. *See* R. 26. Thus, the ALJ properly addressed both the supportability and consistency factors.

The ALJ applied the correct legal standards in evaluating Dr. Peterson's opinion, and substantial evidence supports her finding that it was inconsistent with her own treatment records and the medical records as a whole. Mr. Simmons has not shown that the ALJ erred in her consideration of the medical opinion evidence.

## C. The ALJ's Consideration of the Combined Effect of Impairments

The Eleventh Circuit has held that when considering the total limiting effects of impairments, an ALJ must consider "all of a claimant's medically determinable impairments, even those not designated as severe." *Ehrisman v. Astrue*, 377 F. App'x 917, 919 (11th Cir. 2010); *see Davis v. Shalala*, 985 F.2d 528, 533–34 (11th Cir. 1993); 20 C.F.R. § 404.1545(a)(2). Under the regulations, an ALJ must "consider the combined effect" of a claimant's impairments. 20 C.F.R. § 404.1523(c). "[I]t is certain that mental and psychological defects can combine with

19

physical impairments to create total disability to perform gainful employment." *Bowen v. Heckler*, 748 F.2d 629, 634 (11th Cir. 1984) (internal quotation marks omitted). A statement that an ALJ "considered all symptoms" is not sufficient if the content of the ALJ's decision does not include discussion or findings as to how "all symptoms" affected the claimant's residual functional capacity. *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1269 (11th Cir. 2019).

Mr. Simmons argues that "[t]he ALJ's decision did not adequately address the combination of obesity, fatigue, shortness of breath, obstructive sleep apnea, anxiety, and depression." Doc. 9 at 15 (emphasis omitted); *see also id.* at 17 ("[T]he ALJ failed to consider the interactions between sleep apnea, obesity, fatigue, and shortness of breath."). The Commissioner argues that "the ALJ's analysis makes clear that she considered [Mr. Simmons's] impairments in combination." Doc. 13 at 17. Further, the Commissioner argues that "the ALJ not only made a connection between obesity and other impairments but formulated a set of highly restrictive limitations to account for it." *Id.* at 19.

The ALJ stated that at steps two and three she must consider the "combination of impairments" and that she must consider all impairments when forming the residual functional capacity before step four. R. 18–19. At step two, the ALJ identified Mr. Simmons's severe impairments and also stated:

> In addition to the above severe impairments, the medical evidence of record shows that the claimant has been

20

diagnosed with congestive heart failure, hypertension, obstructive sleep apnea, and diabetes. There is no evidence that these impairments cause more than minimal work-related limitations, but in assessing the claimant's residual functional capacity, I considered all his medically determinable impairments, including those that are nonsevere.

R. 20. She determined that Mr. Simmons "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." R. 20 (emphasis and citation omitted). When making this determination, the ALJ stated that she considered "the record as a whole and . . . the claimant's impairments individually and in combination." R. 20. The ALJ specifically discussed the claimant's mental impairments and included references to his being sleepy, tired, and scared of falling asleep. R. 20–21. The ALJ formed a residual functional capacity that incorporated both exertional and non-exertional limitations – to account for Mr. Simmons's limitations from his impairments. R. 22. Again, at this step, the ALJ specifically stated that she "considered all symptoms." R. 22.

The ALJ cited Mr. Simmons's testimony which addressed his depression, orthopedic issues, anxiety, sleep apnea, dizzy spells, high blood pressure, and shortness of breath. R. 22–23. The ALJ's discussion of Mr. Simmons's treatment history underscores her consideration of all impairments. R. 23–27. Finally, when

discussing inconsistencies in Mr. Simmons's allegations and the objective medical

evidence, the ALJ wrote:

> I note that the claimant's medical treatment records do document severe obstructive sleep apnea but do not show that he has exhibited signs of the pervasive hypersomnia he has alleged. His primary care records do not show that he has reported such symptoms to Dr. Peterson, and her exam notes do not indicate that he has exhibited excessive sleepiness at any of his office visits. I further note that the medical evidence of record does not show that the claimant has the extreme limitations on sitting, standing, and walking that he described in his testimony. While he did require assistance with ambulation for a time after his knee injury and resulting surgery, his physical exam records indicate that he made significant progress, and his subsequent treatment records do not show that he has continued to require any assistive device to aid ambulation. While the claimant has not been definitively diagnosed with a seizure disorder, he has had recurrent syncopal episodes, and I have accordingly restricted him from work involving any exposure to hazards such as unprotected heights and hazardous machinery. In assessing the claimant's residual functional capacity, I considered his obesity according to the guidance in SSR 19-2p, finding that he is limited to work at the sedentary level of exertion with no more than occasional postural activities.

R. 27. The ALJ's decision makes clear that she properly considered the combination

of impairments and determined Mr. Simmons's residual functional capacity

accordingly.

## V.    Conclusion

The ALJ's determination that Mr. Simmons is not disabled is supported by substantial evidence. The Commissioner's final decision is therefore affirmed. A separate order will be entered.

**DONE** and **ORDERED** this 22nd day of September, 2025.

_____

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE